**Commonwealth v. U. S. Steel Corporation**

*Richard S. Ehmann,* for Commonwealth.
*David McN. Olds,* for defendant.

LENCHER, S. J., October 6, 1971.—Plaintiff seeks injunctive relief, a preliminary injunction to restrain alleged violations of the Clean Streams Law of June 22, 1937, P. L. 1987, as amended, 35 PS §691.1, et seq.

On May 17, 1971, defendant filed preliminary objections to the Commonwealth's complaint challenging the jurisdiction of this court to entertain these proceedings rather than the Commonwealth Court, and raising other fundamental questions as to the equitable jurisdiction of the court.

On May 18, 1971, defendant praeciped its preliminary objections onto the next available argument list. Argument on the preliminary objections was thereafter scheduled for June 21, 1971, but the argument has been continued generally by order of this court on motion of the Commonwealth. In open court, at two sessions, we heard the evidence; at its conclusion, defendant moved to dismiss largely on the grounds that no violation of the provisions, supra, has been established, the specific sections being 301 and 307.

Commonwealth alleges the discharge by defendant's employes in its Wheel and Axle Division plant, located in Stowe Township, our county, where it manufactures wheels and axles primarily for railroad car use

and circulates cooling water through the axle forge, which is then pumped into a sewer on defendant's property together with effluent from other processes, a discharge into the Graham Street community sewer, which outfalls into the Ohio River.

On February 18, 1971, an inspector for the Pennsylvania Department of Environmental Resources inspected the said facility, taking samples of water at the axle forge pump and the Graham Street Outfall. The sample at the pump was found to contain oil. Testimony presented by the Commonwealth at the hearing was inconclusive as to whether this "oil" was mineral oil, lubricating oil or hydraulic oil. Analysis of the Graham Street Outfall sample revealed traces of uranine dye which had been introduced into the water at the axle forge pump by the inspector. The Commonwealth admittedly took no samples at defendant's point of discharge into the Graham Street community sewer, nor did it endeavor to analyze the samples taken at the Graham Street Outfall for oil.

A second inspection was made of the aforesaid facility on March 15, 1971. During this inspection samples were taken at the axle forge pump inside the plant. These samples revealed the presence of oil in the axle forge cooling water. Also, uranine dye was added to the cooling water at the axle forge pump, and two samples were taken at the Graham Street Outfall, only one of which was found to contain traces of uranine dye. Again, no samples were taken at the points of defendant's discharge into the Graham Street community sewer.

On March 19, 1971, in response to notice of the presence of oil in its axle forge cooling water, defendant installed an emergency oil removal system consisting of a portable rail car tank connected to the axle forge cooling water pump by flexible piping. A second

portable tank was added to the emergency oil removal system on May 6, 1971.

Meanwhile, then or about April 15, 1971, defendant commenced construction of a permanent oil separator unit adjacent to the axle forge cooling water pump. Break-in operation of the permanent oil separator unit was commenced June 8, 1971.

In connection with the permanent oil separator unit, a preliminary application for a permit was submitted to the department on May 26, 1971. The preliminary permit application indicates that based on sampling data from the emergency oil removal system, installed and operating since March 19, 1971, it is expected that defendant's discharge from the permanent oil separator unit will be 21.1 parts oil per million parts water at the point of discharge into the Graham Street community sewer.

We have carefully considered all of the testimony and are constrained by the preponderance of testimony and inferences reasonably arising therefrom to make, and we do make the following findings of fact:

1. On May 16, 1971, defendant filed preliminary objections to Commonwealth's complaint.

2. Commonwealth took no water samples at defendant's point of discharge into the Graham Street community sewer.

3. Commonwealth took water samples at the Graham Street community sewer outfall into the Ohio River, which samples were never analyzed for oil.

4. The discharge from the Graham Street community sewer outfall into the Ohio River had a gasoline smell.

5. There are several trucking firms below defendant's plant which may be discharging industrial wastes in the form of oil and other petroleum products into the Graham Street community sewer.

6. On March 19, 1971, defendant installed at its Wheel and Axle Division, Stowe Township plant, an emergency oil removal system consisting of a portable rail car tank connected to the axle forge cooling water pump by flexible piping.

7. On May 6, 1971, a second portable tank was added to the emergency oil removal system.

8. On April 15, 1971, defendant commenced construction of a permanent oil separator unit adjacent to the axle forge cooling water pump.

9. On May 26, 1971, a preliminary application for a permit for approval of the permanent oil separator unit was submitted to the Department of Environmental Resources.

10. Break-in operation of the permanent oil separator unit was commenced June 7, 1971.

11. The preliminary permit application recites that defendant's permanent oil separator unit is designed to limit oil concentration in defendant's waste water discharge into the Graham Street Sewer to no more than 21.1 parts oil per million parts water.

It is well to repeat the provisions which defendant has allegedly violated: sections 301 and 307 of the Clean Streams Law. Section 301 of the act prohibits the discharge of industrial wastes into the waters of the Commonwealth "except as hereinafter provided in this act." Section 307 provides, inter alia, that a direct or indirect discharge of industrial waste into the waters of the Commonwealth is prohibited unless:

". . . such discharge is authorized by the rules and regulations of the board *or* such person or municipality has first obtained a permit from the department."

With respect to the particular type of industrial waste discharge here alleged, section 10, Article 600 of the regulations of the board provides:

"Waste waters discharged to the waters of the Commonwealth shall show no more than a slight iridescence and shall at no time contain more than 30 ppm of oil or such lesser amount as the Board may provide for the proper protection of the public interests therein."

By necessary implication, discharge of oil bearing waste waters is authorized by the regulation unless such discharge is demonstrated to contain more than 30 parts oil per million parts water.

Commonwealth, however, not only failed to prove any discharges of oil from defendant's plant in excess of 30 parts oil per million parts water, but also failed to establish that defendant discharged *any* oil either directly or indirectly into the waters of the Commonwealth.

At hearing, Commonwealth presented evidence that water samples taken on February 18, 1971, and March 15, 1971, at the axle forge pump inside defendant's plant contained oil. Additionally, Commonwealth offered into evidence analyses of samples taken on the above dates at the Graham Street community sewer outfall* to the Ohio River. Some of these samples contained traces of uranine dye which had previously been added to the water at the axle forge pump, but none had been analyzed for oil.

Section 307 of the act obviously requires proof of violation at the point of discharge into the waters of the Commonwealth. Where, as here, a "person" discharges into a sewer system which then empties into the water of the Commonwealth, the point of dis-

---

* And we pass by, as did the parties, the possible continuation to discharge here by some other industrial plants in the immediate neighborhood.

charge into such sewer is the relevant point for inquiry. Section 307 provides, in pertinent part:

"For the purposes of this section, a discharge of industrial wastes into the waters of the Commonwealth shall include a discharge of industrial wastes by a person or municipality into a sewer system or other facility owned, operated or maintained by another person or municipality and which then flows into the waters of the Commonwealth."

Admittedly, Commonwealth took no samples at the point of defendant's discharge into the Graham Street community sewer either prior or subsequent to institution of this litigation. The record does not indicate whether samples at this point would have established a violation. The mere fact that some of the samples collected at the Graham Street Outfall contained traces of uranine dye does not establish the discharge of oil, and certainly not the concentration of any oil discharge. Plaintiff offered no scientific evidence that if uranine dye added to the axle forge cooling water were discharged into the Graham Street community sewer, oil in the same water would necessarily also have been discharged. Since the board's standard of 30 parts oil per million parts water is one of concentration and not absolute weight or volume, any number of factors, including the subsequent addition to the axle forge cooling water of other clear effluent from defendant's normal processes prior to discharge into the Graham Street sewer, would have substantially reduced the concentration of oil found at the axle forge pump prior to discharge into the Graham Street sewer. The addition of clear effluent prior to discharge is a normal part of defendant's operation and is described in defendant's preliminary permit application. See defendant's exhibit 3 and 3.1.

This failure to offer proof as to the very essence of

the alleged violation is also a fundamental and fatal defect in Commonwealth's case.

We cannot and do not find a discharge of oil into the Ohio River from the mere fact that water containing oil was discovered inside defendant's plant and traces of uranine dye, not oil, were discovered at the Ohio River outfall of the Graham Street community sewer. Moreover, we are asked to find that such hypothetical discharge was, at the point of discharge into the Graham Street community sewer, in excess of the Board's standard of 30 parts per million. Such a series of assumptions do not meet the burden of proof resting on the Commonwealth.

One other point deserves special emphasis. At the hearing, Commonwealth's witness, Craig E. Yendell, a representative of the department, testified that defendant had made a preliminary application for a permit for an industrial waste treatment facility and discharge prior to hearing, and that the application had been rejected. Under cross-examination he was asked what rule, regulation or law was contravened by the application; and he could point to none. We find nothing in the record that points to any rule, regulation or law violated by defendant's discharge of cooling water containing less than 30 parts oil per million parts water.

Since the Commonwealth does not argue that a discharge of industrial waters without a permit is anything more than a technical violation, clearly, this is not the fact which could of itself authorize us to issue a preliminary injunction. After all, these are the provisions of section 601(b):

"In cases where the circumstances require it or the public health is endangered, a mandatory preliminary injunction or special injunction may be issued upon the terms prescribed by the court, notice of the appli-

cation therefore having been given to the defendant in accordance with the rules of equity practice, and in any such case the Attorney General, the district attorney or the solicitor of any municipality shall not be required to give bond."

We underscore the Commonwealth's refusal without stating any reason to approve the construction and operation of the treatment facility which defendant wishes to construct and use; we underscore a finding to which we are constrained by the evidence that there are no dangers here to public health, no exceptional circumstances that bring the Commonwealth within the statutory provisions for a preliminary injunction. Such may not be ordered because of presence of oil inside an industrial plant which is connected with an outfall into the river. There is no evidence that the plant ever was notified by certified mail of violations discovered, but passing by such provisions and other effective and statutory provisions for the imposition of penalties, we are constrained to find and we do find that defendant took emergency steps to abate any pollution upon being notified that samples taken in February and March indicated oil was present in its axle forge cooling water. Emergency oil collection equipment was installed in mid-March and was improved thereafter. Additionally, a permanent oil separation facility has been installed and is presently in break-in operation. All of these efforts to control any oil discharge could have been undertaken in cooperation with the department, but the Commonwealth filed this bill of complaint, and the other possibilities written into the law for orderly cooperative resolution of any anti-pollution problems have not here been initiated.

On the contrary, Commonwealth admitted it had knowledge of defendant's efforts to control any such

discharges. This knowledge resulted from defendant's filing with the department a preliminary permit application for an oil treatment facility designed to limit any discharge of oil to 21.1 parts per million, well below the standard of 30 parts per million set forth in the regulation.

We cannot find and do not find any "gross pollution." We cannot find and do not find the lack of waste treatment or any other special circumstances justifying the issuance of a preliminary injunction; within the context of the provision and the operation at bar, we cannot and do not find any discharge of industrial waste.

Accordingly, we revert to the legal principles in this type of action remembering that the Commonwealth does not seek a preliminary injunction on the grounds that defendant is creating a public nuisance. See Commonwealth v. Queen Coal Co. et al., 2 Com. Ct. 1. Generally, the Commonwealth is not entitled to a preliminary injunction unless it can prove that it is clearly entitled to such an extraordinary remedy, that there is urgent necessity to avoid injury during the pendency of his action for a permanent injunction which cannot be compensated for by money damages, and that greater injury will be done by refusing the injunction than by granting it: Gillette Company v. Master, 408 Pa. 202, 182 A. 2d 734 (1962); Schwab v. Pottstown Borough, 407 Pa. 531, 180 A. 2d 921 (1962); Keystone Guild, Inc. v. Pappas, 399 Pa. 46, 159 A. 2d 681 (1960); Herman v. Dixon, 393 Pa. 33, 141 A. 2d 576 (1958). None of these prerequisites to the issuance of preliminary injunctive relief have been established by Commonwealth in the present case We adopt defendant's request to find and/or conclude that the Commonwealth has failed to prove

a violation of the act; no evidence was offered reasonably capable of supporting an inference that defendant was discharging oil into the Ohio River or that any discharge by defendant was in excess of that authorized by the regulations. Nor was any probative testimony offered as to the effect on the environment of the alleged discharge of oil.

Commonwealth's failure to establish the probability of continuing irreparable harm provides an additional reason for denying its application for a preliminary injunction. Defendant's emergency oil collection system has been continuously in operation since March 19, 1971, until recently replaced by a permanent oil collection system designed to limit the discharge of oil to below the 30 parts per million set forth in the regulation.

We do not accept the Commonwealth's insistence that the violation of a statute constitutes sufficient irreparable harm to require the granting of equitable relief. However, not only has Commonwealth failed to prove any violation of the act, but also the authority cited by Commonwealth does not support such a proposition.

Looking closely to this record, we can make no findings on alleged past violations. Certainly, as of March 1971, the plant has installed and improved its treatment facilities. There is no evidence on the basis of which we could convict this defendant of immediate harm chargeable to this defendant, and constituting a threat to public health; oil from defendant's plant was not discharged directly or indirectly into the river. But what is far more important, we are constrained by uncontradicted testimony to find and we do find that defendant has taken cautious, serious steps to remove oil from the waste water inside the

plant; the record shows that the Commonwealth did not timely move to discover the actual point of discharge into the public sewer.

So that the parties may make and take specific exceptions to be argued presumably at the same time a court en banc hears the challenge to jurisdiction of the subject matter, we declare these conclusions of law as requested by defendant:

## CONCLUSIONS OF LAW

1. Section 10 of article 600 of the regulations allowed discharge into a sewer flowing into the waters of the Commonwealth of oil bearing waste waters containing less than 30 parts oil per million parts water.

2. Commonwealth failed to prove that defendant discharged oil into the Graham Street community sewer.

3. Defendant did not violate the Pennsylvania Clean Streams Law, since at the point of discharge into the Graham Street community sewer there was no proof said discharge carried oil in excess of 30 parts oil per million parts water.

4. Commonwealth failed to prove that defendant's discharge into the Graham Street community sewer was in violation of the Clean Streams Law in any respect.

5. Commonwealth failed to prove that defendant discharged oil directly or indirectly into the Ohio River.

6. Commonwealth failed to establish special circumstances or a health hazard justifying issuance of a preliminary injunction as required by section 601(b) of the Clean Streams Law.

7. Commonwealth failed to establish that its right to a preliminary injunction was clear.

8. Commonwealth failed to establish that there was an urgent need to avoid irreparable harm during the

pendency of Commonwealth's request for a permanent injunction.

If there could or should be one central fact that stands out above all others, it is our finding that the Commonwealth not only refused to approve the construction and installation of equipment that would have diminished any improper and/or unlawful discharge, if we could find one as we did not; it is the admitted refusal of the Commonwealth's officers not only to approve the plans for even more facilities relevant to the Commonwealth's complaint, but the candid statement of the Commonwealth's witness in charge of this matter that he was given no reason to assign for such refusal.

## ORDER

And now, to wit, October 6, 1971, after hearing the evidence in open court, and carefully considering all of it and the briefs filed, issuance of a preliminary injunction is refused and denied; exceptions noted to the Commonwealth and bill sealed.